Mark S. Lichtenstein
**CROWELL & MORING LLP**
590 Madison Avenue, 20th Floor
New York, NY  10022
Telephone:  (212) 223-4000
Fax:  (212) 223-4134
mlichtenstein@crowell.com
Proposed Counsel for Debtors and Debtors in Possession

|  |  |
|---|---|
| In re: | ) UNITED STATES BANKRUPTCY COURT<br>) FOR THE DISTRICT OF NEW JERSEY<br>) |
| NORTH COUNTRY BBQ VENTURES, INC., *et al.*, | ) CASE No. 09-44194 (MS)<br>)<br>) (Joint Administration Pending) |
| Debtors[1]. | )<br>) Chapter 11<br>) |
|  | ) Auction Procedures Hearing Date and Time:<br>) December 22, 2009, at 2:00 p.m.<br>)<br>)<br>) |

### DEBTORS' AMENDED VERIFIED APPLICATION FOR (I) AUTHORITY TO SELL ALL OR SUBSTANTIALLY ALL OF THEIR ASSETS, (II) AUTHORITY TO ASSUME AND ASSIGN EXECUTORY CONTRACTS AND UNEXPIRED LEASES AND (III) APPROVAL OF THE AUCTION PROCEDURES RELATED THERETO

North Country BBQ Ventures, Inc. ("NCBBQ Parent"), and certain of its subsidiaries, as

debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors" or the

"Companies")[2], file this amended verified application (the "Verified Application") for entry of

---

[1] Because the motion for joint administration of these cases has not yet been approved and the order not yet entered, the Debtors have filed each of their "First Day" motions in each of their cases.  Specifically, the case numbers for each of the Debtors cases are as follows:  North Country BBQ Ventures (Brick), LLC Case No. 09-44217; North Country B.B.Q. Ventures (Hamilton); LLC Case No. 09-44220; North Country BBQ Ventures (Hillsborough), LLC Case No. 09-44222; North Country BBQ Ventures (Manchester), LLC Case No. 09-44227; North Country BBQ Ventures (Mountainside), LLC Case No. 09-44228; North Country BBQ Ventures (New Brunswick), LLC Case No. 09-44229; North Country BBQ Ventures (Smithtown), LLC Case No. 09-44234; North Country BBQ Ventures (Woodbridge), LLC Case No. 44237; North Country BBQ Ventures (Westbury), Inc. Case No. 09-44235.
[2] The Debtors and their respective Tax ID numbers are as follows: North Country BBQ Ventures Inc., Tax ID No. 20-0269881; North Country BBQ Ventures (Hillsborough), LLC ("NCBBQ Hillsborough"), Tax ID No. 02-

an order (the "Order") order implementing procedures for the filing of claims under the

Perishable Agriculture Commodities Act of 1930, as amended, 7 U.S.C. §§ 499(a), *et seq.*

("PACA") and authorizing (but not directing) payment of PACA claims in the Debtors'

discretion. In support of this Motion, the Debtors respectfully state as follows:

## INTRODUCTION

1.      By this application (the "Sale Motion"), the Debtors request, pursuant to sections

105, 363 and 365 of chapter 11, title 11 of the United States Code (the "Bankruptcy Code") and

Rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

Rules"), authorization to conduct an auction and, thereafter, sell all or substantially all of their

assets (the "Assets"). In order to facilitate an orderly sale of their Assets (a "Sale"), the Debtors

further request that this Court establish various bidding procedures and guidelines, as set forth

herein.

2.      Specifically, by this Sale Motion, the Debtors request that the Court enter the

following orders:

- The Bidding Procedures Order: The Debtors request that the Court enter
  the proposed order (the "Bidding Procedures Order") approving **(i)** the
  auction bidding procedures annexed hereto as **Exhibit "A"** (the "Auction
  Procedures") in connection with the proposed sale of the Assets to the
  Buyer (defined below) or a qualified bidder submitting a higher or
  otherwise better offer, (ii) a form of notice of certain executory contracts
  and unexpired leases expected to be assumed and assigned in connection
  with the Sale (the "Assumption and Assignment Notice"), annexed hereto
  as **Exhibit "B"; (iii)** notice of the auction (the "Auction") and the sale

---

0613337; North Country BBQ Ventures (Hamilton), LLC ("NCBBQ Hamilton"), Tax ID No. 37-1446931; North
Country BBQ Ventures (New Brunswick), LLC ("NCBBQ New Brunswick"), Tax ID No. 51-0456318; North
Country BBQ Ventures (Woodbridge), LLC ("NCBBQ Woodbridge"), Tax ID No. 20-4458841; North Country
BBQ Ventures (Westbury), LLC ("NCBBQ Westbury"), Tax ID No. 20-2250118; North Country BBQ Ventures
(Mountainside), LLC ("NCBBQ Mountainside"), Tax ID No. 22-3848554; North Country BBQ Ventures (Brick),
LLC ("NCBBQ Brick"), Tax ID No. 04-3680204; North Country BBQ Ventures (Smithtown), LLC ("NCBBQ
Smithtown"), Tax ID No. 20-0317310; and North Country BBQ Ventures (Manchester), LLC ("NCBBQ
Manchester"), Tax ID No. 20-2181325. The Debtors, excluding NCBBQ Parent, are collectively referred to as the
"NCBBQ Subsidiaries" or the "Subsidiary Debtors."

hearing (the "Sale Hearing"), in the form annexed hereto as **Exhibit "C"** (the "Auction and Hearing Notice"); **(iv)** the asset purchase agreement in the form annexed hereto as **Exhibit "D"**; and **(v)** establishing the dates, time and place of the Auction and the Sale Hearing.

- The Sale Order: The Debtors further request that the Court enter an order (the "Sale Order") following the Auction for the approval of (i) the sale of the Assets free and clear of liens, claims and encumbrances, and (ii) the assumption and assignment of certain executory contracts and unexpired leases in connection with such sale[3] and (iii) the exemption of the sale of the Assets from stamp or similar taxes.

Although the Debtors seek entry of both orders through this Motion, the Debtors only seek entry of the Bidding Procedures Order on a "First-Day" basis, and request that the Court set a subsequent hearing on the relief requested in Part II of this Motion, to be provided by the Sale Order.

## JURISDICTION AND VENUE

3.     This Court has jurisdiction to consider the Sale Motion pursuant to 28 U.S.C. §§ 157 and 1334. Consideration of this Sale Motion is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

4.     On December 18, 2009 (the "Petition Date"), each of the Debtors filed a voluntary petition in this Court under chapter 11 of title 11 of the United States Code §§ 101, et seq. (the "Bankruptcy Code"). The Debtors continue to operate their business and manage their property as debtors-in-possession.

5.     No trustee or creditors' committee has yet been appointed in these cases.

---

[3] By this Sale Motion, the Debtors' reserve their right to reject any agreement not to be assumed or assigned and will seek rejection of such agreements pursuant to this Sale Motion once such agreements are identified.

6.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.   Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.   This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

## THE DEBTORS

7.      NCBBQ Parent is a privately held Delaware corporation, owned by Reiss Capital Management LLC (31.1%), SFIP Limited Partnership (7.8%), Robert A. Fanelli (5.8%), K. Tucker Anderson (5.3%), and numerous other owners (none of which owns more than 5% of NCBBQ Parent).

8.      NCBBQ Parent owns 100% of the limited liability company interests of each of the Subsidiary Debtors other than NCBBQ Brick, of which it owns 80%. The Debtors maintain their corporate offices at 571 Central Ave, Suite 106, New Providence, New Jersey 07974, and currently employ approximately 1024 full time and part-time employees (excluding insiders).

## THE DEBTORS' BUSINESS

9.      NCBBQ Parent is one of the largest franchisees of Famous Dave's.  Famous Dave's is a successful restaurant franchisor that, over the last 14 years, has established itself as a proven brand in the unique niche of the casual dining segment, serving high quality barbeque foods in a themed atmosphere that is fun and family friendly.

10.     In 2001, NCBBQ Parent acquired the rights to operate Famous Dave's restaurants in the Northeast. NCBBQ Parent raised equity capital from several individuals and entities, and obtained debt capital from Wells Fargo Bank, National Association, as Administrative Agent (in such capacity, "Agent"), and lender (in such capacity, "Wells Fargo" or the "Lender"), pursuant to the terms and conditions of the Prepetition Credit Agreement.

11.     Currently, the Companies operate nine Famous Dave's restaurants located in Northern New Jersey, Long Island, New York, and Manchester, New Hampshire.   Each

restaurant is held in its own limited liability company, and, as noted above, other than NCBBQ

Brick, of which NCBBQ Parent owns 80%, all other NCBBQ Subsidiaries Debtors are owned

100% by NCBBQ Parent. The remaining 20% membership interest of NCBBQ Brick is owned

by Robert and Betty Nankervis.

## DEBT STRUCTURE

12.    On December 1, 2006, the Debtors, along with several other non-debtor affiliates[4]

(the "Borrowers"), Agent and Lender entered into that certain Credit Agreement dated as of

December 1, 2006 (the "Original Credit Agreement"). The Original Credit Agreement has been

amended by the First Amendment to Credit Agreement dated as of March 13, 2008 (the "First

Amendment"), the Second Amendment to Credit Agreement dated as of October 23, 2008 (the

"Second Amendment"), the Third Amendment to Credit Agreement and Forbearance Agreement

dated as of November 25, 2009 (the "Third Amendment"), and the Fourth Amendment to Credit

Agreement and Forbearance Agreement dated as of December 11, 2009 (the "Fourth

Amendment") (the Original Credit Agreement together with the First Amendment, Second

Amendment, Third Amendment and Fourth Amendment shall be referred to hereinafter

collectively, as the "Prepetition Credit Agreement").

13.    Pursuant to the Original Credit Agreement, the Lender made a term loan to the

Borrowers in the principal amount of $15,000,000 (the "Loan"), as evidenced by that certain

Term Loan Note dated as of December 1, 2006 in the original principal amount of $10,000,000

(the "Term Note") and that certain Revolving Credit Loan Note dated as of December 1, 2006 in

---

[4] North Country BBQ Ventures, LLC, North Country BBQ Ventures (Atlantic City), LLC, North Country BBQ Ventures (Stamford), LLC, North Country BBQ Ventures (Saugus), LLC, and North Country BBQ Ventures (Braintree), LLC are each parties to the Prepetition Credit Agreement (as defined hereafter) but have not filed bankruptcy petitions. These entities may file bankruptcy petitions at a later date.

the original principal amount of $5,000,000 (the "Revolving Credit Note," and together with the

Term Note, collectively, the "Notes"), made by Borrowers payable to the Lender.

14.    The obligations owed under the Prepetition Credit Agreement are secured by,

among other things, leasehold mortgages on the restaurant properties for the Brick, Hamilton,

Smithtown, Westbury, and Saugus locations evidenced by a Leasehold Mortgage, Assignment of

Leases and Rents, and Fixture Filing for each property; an Assignment of Leases and Rents for

Units 3036, 3040, 3088, and 3092; UCC Fixture Filings filed with Ocean County, New Jersey,

Atlantic County, New Jersey, Suffolk County, New York, Nassau County, New York, and Essex

County, Massachusetts; UCC Financing Statements filed with the Delaware Secretary of State.

15.    Pursuant to the First Amendment, the Lender and the Borrowers agreed, among

other things, that the maximum amount of the revolving credit commitment would be

$1,500,000.00.   Pursuant to the Second Amendment, the Lender and the Borrowers agreed,

among other things, that the maximum amount of the revolving credit commitment would be

$1,000,000.00.  Pursuant to the Third Amendment, the Lender and the Borrowers agreed, among

other things, that the outstanding term loan obligations were in the amount of $9,625,000.00, the

outstanding principal balance of the revolving credit loan obligations were in the amount of

$1,750,000.00, the outstanding termination fee due pursuant to the termination of a swap

agreement with Wells Fargo was $597,000.00, and the outstanding interest  (not including,

among other things, certain fees and charges due and owing under the Prepetition Credit

Agreement and related loan documents) due in connection with the foregoing obligations was

$664,493.02.  Also pursuant to the Third Amendment, the Lender and the Borrowers agreed to

(i) extend the maximum revolving credit commitment to $2,700,000.00, (ii)  a budget governing

expenditures through and including December 18, 2009, the anticipated date of the filing of

voluntary bankruptcy petitions for the Companies, and (iii) have the Companies initiate a sale process whereby (a) the Companies would enter into a letter of intent with a stalking horse bidder for the sale of all assets by no later than November 20, 2009, (b) due diligence would be concluded by the stalking horse bidder by December 7, 2009, (c) the Companies and the stalking horse bidder would enter into a binding asset purchase agreement by no later than December 7, 2009, (d) the Companies would immediately hire an investment banker to market the Assets for sale, and (e) upon the Companies filing of bankruptcy petitions, they would expeditiously prosecute a motion for approval of the auction procedures for the sale of the Assets to the stalking horse bidder, subject to higher and better offers.

16.    Pursuant to the Fourth Amendment, the Lender and the Borrowers modified and extended the deadlines set forth in the Third Amendment for the Borrowers to enter into a letter of intent with the stalking horse bidder by no later than December 7, 2009, for the conclusion of due diligence by no later than December 11, 2009, and for entry into an asset purchase agreement by no later than December 16, 2009.[5] The parties to the Fourth Amendment also agreed to expand the maximum revolving credit loan commitment to $2,900,000.00 pursuant to a revised budget.

17.    In addition to the secured debt, the Debtors owe substantial sums to other creditors. Specifically, the Debtors owe approximately $850,000.00 in franchise fees to Famous Dave's.

---

[5] The December 16, 2009 deadline was formally extended to December 17, 2009 in writing pursuant to the terms of the Fourth Amendment.

## EVENTS LEADING TO FILING OF PETITIONS

18.     From 2006 to 2008, the NCBBQ Parent and the NCBBQ Subsidiaries experienced significant problems as a result of the poor performance of the Companies and other issues regarding the management of the Companies.

19.     The poor performance of the Companies and other issues with prior management left the Companies in a very difficult predicament.  Because the enterprise was severely undercapitalized, multiple defaults existed under the Credit Facility, the Franchise Agreements with Famous Dave's, various leases for existing restaurants and several other restaurants that the Debtors were planning to open, and under the Companies' key vendor relationships, including food purveyors.  Ultimately, the Companies lacked available funds to timely pay the vendors, landlords, secured creditors and other creditors, such as taxing authorities.

20.     In or about February 2009, existing management was replaced at the insistence of the Board of Directors due to poor performance and other issues.  The Companies hired SRDP and its highly experienced management team to turn around the franchises.

21.     By any measure, SRDP has done an excellent job cutting costs, increasing efficiencies, entering into settlement agreements with vendors to permit payment of outstanding debt over a reasonable period of time, and coordinating with Wells Fargo to ensure sufficient liquidity to permit the Companies to operate profitably and continue to satisfy the debt owed to Wells Fargo and other significant trade debt so that disgruntled creditors would not disrupt the conduct of the business and the pursuit of a turnaround.  SRDP was very effective in reaching a number of settlements with critical contract counter-parties and creditors such as the taxing authorities, food vendors and Famous Dave's.

22.     With SRDP at the helm, the Companies entered into discussions with Wells Fargo aimed at reaching an agreement pursuant to which Wells Fargo would modify and extend the

terms of its secured debt and/or convert all or a portion of such debt into equity in the Companies. Ultimately, however, Wells Fargo and the Company were unable to reach agreement on a debt restructuring or a restructuring of the Company's capital structure,and therefore it was determined that a sale of all the assets of the Debtors pursuant to a Section 363 auction was the only available alternative and would be in the best interests of the estates.

23.     Wells Fargo, as "DIP Lender" did agree with the Debtors to extend additional funds to the Debtors pursuant to an agreed-upon budget to permit the Debtors to continue operating while seeking to market and sell their assets pursuant to section 363 of the Bankruptcy Code, in a coordinated effort to maximize the value of the assets for the benefit of all interested parties. In light of the fact that the Companies were running at a conditions under which the DIP Lender agreed to extend further funds to the Companies, the Board of Directors and management, cognizant of their fiduciary duties to maximize the value of the enterprise to benefit all stakeholders, determined to pursue a section 363 sale of the Debtors' assets in Chapter 11.

24.     Accordingly, the Debtors entered into (i) the LOI with Famous Dave's, dated as of December 7, 2009, (ii) an Asset Purchase Agreement with Famous Dave's (the "FD APA") (iii) an engagement letter with Brookwood Associates, L.L.C. ("Brookwood"), dated as of November 25, 2009, as investment bankers to solicit interest in competitive bids for the Debtors' assets, and (iv) an agreement for consensual cash collateral use and to obtain DIP financing from Wells Fargo pursuant to a budget to carry the Debtors through the process of preparing bankruptcy petitions and other necessary pleadings, a hearing on a motion to sell the assets, the ultimate sale of the assets, and a resolution of their bankruptcy cases.

## THE DEBTORS' EFFORTS TO MARKET THEIR ASSETS FOR SALE

25.     On or about December 7, 2009, the Companies entered into a Letter of Intent for

the sale of all of their Assets to Famous Dave's.  On December 17, 2009, the Companies entered

into the FD APA to sell all of their Assets to Famous Dave's pursuant to an auction governed by

Section 363 of the Bankruptcy Code (the "Auction"), subject to higher and better offers.

26.     Prior to the Petition Date, the Debtors have actively marketed the Assets for sale

with the assistance of Brookwood, an experienced investment banker with particular expertise in

the marketing and sale of middle market restaurant franchises similar to the Assets to be sold

here.  Prepetition efforts have included preparation of an offering memorandum and creation of a

virtual data room.  That marketing effort will continue subsequent to the filing of the bankruptcy

cases, up to the time of the auction, in an attempt to attract alternative bids and generate robust

bidding.

27.     Contemporaneously herewith, the Debtors have filed an application to employ

and retain Brookwood as their investment banker on the terms and conditions set forth therein.

28.     The Debtors have provided and will continue to provide potential bidders who

sign confidentiality agreements with access to certain books and records and facilities, including

access to the Debtors' management, to perform due diligence in connection with a potential bid

for the assets.  Based on the foregoing, the Debtors, in consultation with their professionals, have

determined to seek to sell the Assets through an orderly sale process, with the FD APA as the

stalking horse bid and an opportunity for other interested parties to bid at the Auction.

29.     The Debtors have determined, in their reasonable business judgment, that it is in

the best interests of their estates and creditors to sell the Assets through an Auction.  As may be

required by the Debtors' fiduciary obligations, the Debtors will consider all qualified bids for

Assets  submitted in accordance with the Bidding Procedures Order.  Wells Fargo, the most

significant creditor in these cases, agrees with this strategy and the parties are working together

to maximize the value of the subject assets for the benefit of all stakeholders, including

unsecured creditors.

## BIDS RECEIVED AS A RESULT OF DEBTORS' MARKETING EFFORTS

30.    As noted above, based upon the prepetition marketing of the Assets, the Debtors

have received one bid, resulting in the execution of the FD APA between the Debtors, on the one

hand, and Famous Dave's ("Buyer" or the "Purchaser"), on the other hand.  An executed copy of

the FD APA is annexed hereto as **Exhibit "D"**.

31.    The FD APA contains, *inter alia*, the following pertinent terms:[6]

(A)    Purchased Assets.  On the terms and conditions of the FD APA, the
Debtors hereby agree to sell, transfer, convey and deliver to Purchaser, and Purchaser
hereby agrees to purchase from Debtors, on and as of the Closing Date, all property and
assets of Debtors, of every kind and description, real or personal, tangible or intangible,
used in the operation of the Business, not including the Excluded Assets (the "Purchased
Assets").  The Purchased Assets shall include, without limitation, the following:

(1)    all furniture, fixtures, equipment, smallwares, machinery,
computers, point of sale hardware and software, décor items, memorabilia and
other tangible personal property used or held in the Business including, but not
limited to, all of the personal property described in Schedule 2.1(a) to the FD
APA;

(2)    all right, title and interest of Debtors in and to all Real Estate
Leases (excluding any Real Estate Lease for an Excluded Restaurant) all
Franchise Agreements (excluding any Franchise Agreement for an Excluded
Restaurant), and all other Assigned Contracts identified on Schedule 2.1(b);

(3)    all inventory, raw materials and supplies of the Business, wherever
located, including but not limited to all rights of Debtors as to all suppliers
associated with the Business, together with all uniforms, paper goods and
promotional items used by Debtors in the operation of the Business;

---

[6] This description of the FD APA is intended only as a summary.  Any conflicts between the terms related in this
Motion and those contained in the FD APA shall be resolved in favor of the FD APA.  Parties should review the FD
APA for a complete understanding of the transaction.  All capitalized terms not defined herein shall have the
meaning ascribed to them in the FD APA.

(4)    unlimited access to during reasonable business hours and Purchaser's ability to make copies of the Books and Records for up to six (6) months after the Closing Date;

(5)    all rights of Debtors under any warranty or guarantee by any manufacturer, supplier or other transferor of the Purchased Assets for the Business;

(6)    all of the intangible rights and property used in Debtors' conduct of the Business, including without limitation, Debtors' intellectual property rights to technology, licenses, construction or plans, drawings, memos, blueprints, and other work product of consultants or architects, telephone numbers, telecopy numbers and e-mail addresses and listings relating to the Business;

(7)    to the extent legally transferable, all permits, licenses and approvals received from any governmental entity for the Business;

(8)    all leasehold improvements, signage and prepaid deposits in the possession of the applicable non-Seller counterparties for the Business;

(9)    all rights, claims and causes of action of Debtors against third parties relative to the Purchased Assets and the proceeds thereof, excluding Avoidance Claims, tort claims against Debtors' current and former officers and directors, rights, claims and causes of action relating to any Excluded Restaurant, credit card payments that are in process and that originate from sales occurring prior to and including the Closing Date, and claims giving rise to Debtors' rights of set off with respect to its creditors; and

(10)    any and all other properties, assets and rights of Debtors which are used in Debtors' conduct of the Business.

(B)    Effective as of the Closing Date, Debtorss will transfer the Purchased Assets to Purchaser, by delivering the Transaction Documents together with all required consents of any and all third parties, free and clear of all Taxes, Encumbrances or any other adverse claims of any kind.

(C)    Assumed Liabilities.  Purchaser is not assuming liabilities, except for Taxes and liabilities associated with and arising under the Purchased Assets from and after the Closing Date.  Moreover, outstanding gift cards will be honored by Famous Dave's subsequent to the Closing Date.

(D)    Purchase Consideration.  Subject to adjustment pursuant to Section 3.3 of the FD APA, the aggregate consideration for the Purchased Assets will be $5,000,000.00 (the "Purchase Consideration").  The Purchase Consideration will be payable on the Closing Date as follows:

(1)    The Cure Amount owing in connection with Debtors' assumption and assignment to Purchaser of the Franchise Agreements, excluding the Cure

Amount owing under the Franchise Agreement for any Excluded Restaurant, shall be credited to and retained by Purchaser;

(2)    The Cure Amount owing in connection with Debtors' assumption and assignment to Purchaser of the Real Estate Leases, excluding the Cure Amount owing under the Real Estate Lease for any Excluded Restaurant, shall be paid directly to each landlord under the Real Estate Leases; and

(3)    Purchaser shall pay the balance of the Purchase Consideration to Debtors or Debtors' designee(s) pursuant to instructions to be provided by Debtors to Purchaser on or prior to the Closing Date, or otherwise in accordance with any Final Order entered by the Court.

(E)    <u>Disputed Cure Amounts</u>. If, on the Closing Date, the Cure Amount is in dispute, the Purchaser shall deposit the maximum amount of the alleged Cure Amount into a segregated account pending the entry of a Final Order by the Bankruptcy Court resolving such dispute. Within five (5) Business Days following delivery by Debtors to Purchaser of a Final Order from the Bankruptcy Court approving resolution of any dispute over the actual or claimed Cure Amount, any amount deemed to be a Cure Amount shall be credited to and retained by Purchaser or paid directly to each landlord and the balance shall be paid to Debtors or Debtors' designee(s) in cash pursuant to instructions to be provided by Debtors to Purchaser.

(F)    <u>Adjustment to Purchase Consideration for Excluded Restaurants</u>. If any of the Real Estate Leases for the Restaurants located at (i) 1707 S. Willow Street, Manchester, New Hampshire, (ii) 53 Lafayette Avenue, Metuchen, New Jersey, or (iii) 315 Route 206, Hillsborough, New Jersey is not amended pursuant to a Lease Amendment satisfactory to Purchaser, the Purchaser may elect to declare such Restaurant an Excluded Restaurant, then the Purchase Consideration shall be reduced by the amount corresponding to such Restaurant as set forth below:

| Restaurant | Reduction to Purchase Consideration |
|---|---|
| 1707 S. Willow Street, Manchester, New Hampshire | $210,000.00 |
| 53 Lafayette Avenue, Metuchen, New Jersey | $240,000.00 |
| 315 Route 206, Hillsborough, New Jersey | $40,000.00 |

## RELIEF REQUESTED

32.    The Debtors respectfully request, pursuant to sections 105, 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006, (a) entry of the Bidding Procedures Order approving (i) the Auction Procedure, (ii) the Auction and Hearing Notice, and (iii) the Assumption and Assignment Notice; and (b) entry of the Sale Order approving (i) the

sale of the Assets free and clear of liens, claims and encumbrances to the Buyer, or a qualified bidder submitting a higher or otherwise better offer, (ii) the assumption and assignment of certain executory contracts and unexpired leases in connection with the sale of the Assets, and (iii) the exemption of the sale of the Assets from stamp or similar taxes.

33.    The Debtors expressly reserve the right, subject to consultation with their professionals and prior consent of Wells Fargo, to modify the relief requested in the Sale Motion prior to or at the applicable hearings, including the proposed Auction Procedures, to better promote the goals of the bidding process.

34.    In this Sale Motion, the Debtors seek approval of the Bidding Procedures Order which contains specific Auction Procedures, including the manner in which the Auction and Hearing Notice is to be provided, as well as approval of the sale of the Assets free and clear of liens, claims and encumbrances after a further hearing to be set by the Court.

## PART I

### A.    The Auction Procedures

35.    The FD APA constitutes a stalking horse bid, to provide a basis for the Debtors and Brookwood to generate competing bids in the marketplace using the sale process described below so as to ensure that the estates realize the maximum value for the Assets. The Debtors' proposed process for continuing to market the Assets for sale (the "Auction Procedures") is intended to ensure that all interested parties can participate in an open and fair process, as contemplated by Section 363 of the Bankruptcy Code. The parties believe that the timing contemplated by the Auction Procedures, together with the prepetition efforts conducted to date, will provide ample opportunity to generate a competitive bidding process, while keeping to a reasonable minimum the extent to which the DIP Lender continues to fund the cash deficit currently generated by the Debtors..

36.    Accordingly, as set forth above and in an effort to ensure that maximum value is obtained for the Assets, the Debtors request that the Court approve the following Auction Procedures.    While **all interested bidders should read the Auction Procedures in their entirety**, a summary of the Auction Procedures follows:

a.    <u>Auction and Hearing Notice</u>.  On a date no later than three (3) business days following entry of the Bidding Procedures Order, the Debtors shall mail the Auction and Hearing Notice by first class mail, postage prepaid, to (a) all potential purchasers identified by the Debtors or Brookwood, (b) the Office of the United States Trustee, (c) each of the Debtors' twenty (20) largest unsecured creditors, (d) counterparties to all executory contracts and unexpired leases, (e) the parties in interest who have requested notice pursuant to Bankruptcy Rule 2002, (f) all known entities holding or asserting a security interest in or lien against any of the Assets, and (g) all government agencies required to receive notice of proceedings under the Bankruptcy Rules.  All other creditors of the Debtors will receive notice by publication within three days after entry of the Bidding Procedures Order and again one week before the Auction Date in an appropriate publication.

b.    <u>Single Sale</u>.  It is the Debtors' strong preference that the Assets be sold to a single bidder, in a single sale. All bidders shall have signed an asset purchase agreement (each, an "<u>APA</u>") no less favorable than the FD APA, as determined in the Debtors' discretion, in consultation their professionals and Wells Fargo (in its capacity as Prepetition Agent and DIP Agent, as such terms are defined in the Interim DIP Order)

c.    <u>Confidentiality Agreement and Selection of Qualified Bidders</u>.  Potential purchasers shall be required to complete and execute the confidentiality agreement and provide the Debtors with their financial qualifications and such other information that the Debtors may reasonably request.  Prior to the Auction, the Debtors and their professionals, in consultation with Wells Fargo, must qualify potential purchasers for continuing with the sales process. The Debtors shall promptly notify potential purchasers who have returned the confidentiality agreement and who have satisfactory financial qualifications that they have been selected as a qualified bidder (the "<u>Qualified Bidders</u>").

d.    <u>Qualified Bids</u>.  In order to bid, a bidder (other than Famous Dave's and Wells Fargo) must meet the conditions in this paragraph (in aggregate, a "<u>Qualified Bid</u>").  On or before 12:00 noon (EST) on _____ (the "<u>Initial Bid Deadline</u>"), counsel for the Debtors must actually receive from each bidder a written bid for the Assets, including (i) an executed APA based upon the form of the FD APA and a redline of the bidder's APA against

the FD APA, which APA shall be no less favorable than the FD APA, as determined in the Debtors' discretion in consultation with their professionals and Wells Fargo – but in any case, the proposed bid must exceed the Purchase Consideration offered in the FD APA by $50,000 plus either (a) $150,000, if the proposed bid contemplates assignment of the Famous Dave's Franchise Agreement in connection with the purchase of the Assets or (b) $250,000, if the proposed bid contemplates purchase of the Assets without assignment of the Famous Dave's Franchise Agreement; (ii) a statement indicating (c) the procedure for how long the potential bidder reasonably anticipates it will take for the bidder to obtain all necessary government approvals (including, but not limited to, liquor licenses) and, if applicable, any extra consideration offered by the potential bidder to compensate the Debtors for the possibility that it may not be able to close the transaction as quickly as the Buyer because of the time necessary to obtain such government approvals; and (d) how, if at all, the proposed bid materially differs from the FD APA (other than by the amount of cash consideration offered) and the aggregate value of the consideration the bidder proposes to pay under the bid (which statement of value shall not be binding on the Debtors or the Court); and (iii) a statement that the proposed bid is irrevocable until two (2) business days after the Assets have been sold pursuant to the closing of a Sale or Sales approved by the Bankruptcy Court. Each bidder must also provide an earnest money deposit to Debtors' counsel equal to ten percent (10%) of the total proposed bid amount (the "Deposit") in the form of a certified check or wire transfer payable to the trust account of Debtors' counsel **at least three (3) business days before the Auction.** The Qualified Bid must (i) identify the bidder (including the authorized representative to attend the Auction), the contact information for such bidder (including e-mail addresses, if available), the identity of the bidder's counsel, and contact information for such bidder's counsel (including e-mail addresses, if available) and (ii) contain such documents and information so as to establish the bidder's financial ability to close, to fund the purchase price, and to provide adequate assurance to counterparty of Subject Contracts (as defined below) to be assumed by the bidder ("Adequate Assurance Packages"). Notwithstanding the foregoing, Famous Dave's and Wells Fargo shall be deemed Qualified Bidders and the FD APA shall be deemed a Qualified Bid. Any interested bidder should contact Mark S. Lichtenstein, Esq., Crowell & Moring LLP, 590 Madison Avenue, 20th Floor, New York, New York 10022-2524, Tel: 212-895-4267, Fax: 212-895-4201, to seek to become a Qualified Bidder and, thereafter, to request information in connection with its due diligence. Not later than two (2) business days after a potential bidder delivers all of the materials required by this paragraph, the Debtors shall determine, in consultation with their professionals and Wells Fargo, and shall notify the potential bidder, if such potential bidder has submitted a Qualified Bid.

e.   Due Diligence. Only Qualified Bidders will be allowed to perform reasonable due diligence on the Assets. Neither the Debtors nor their representatives shall be obligated to furnish information of any kind whatsoever to any person that is not determined to be a Qualified Bidder or its representatives. The Debtors will afford any Qualified Bidder the time and opportunity to conduct reasonable due diligence; provided, however, that the Debtors shall not be obligated to furnish any due diligence information after the Bid Deadline. The Debtors will designate an employee or other representative to coordinate all reasonable requests for additional information and due diligence access from such Qualified Bidders. Neither the Debtors nor any of their respective representatives are obligated to furnish any information to any person other than a Qualified Bidder or its representatives. Neither the Debtors nor their representatives are responsible for, and will bear no liability with respect to, any information obtained by Qualified Bidders pursuant hereto.

f.   Deposit Forfeit.[7] The Deposit will be forfeited as liquidated damages and the Successful Bidder (defined below) will be held liable for compensatory damages if the Successful Bidder fails to close by reason of its breach of the contract of sale to be signed by the Debtors and the Successful Bidder (the "Contract"), subject to the terms of the respective APA. The Deposit will also be forfeited by a Qualified Bidder if it withdraws or modifies its bid other than as provided herein before the Bankruptcy Court approves the Debtors' selection of the Successful Bidder.

g.   No Contingencies. Bids must not be subject to financing, due diligence, the receipt of any further bidding approval, environmental, engineering or any other contingencies not expressly approved by the Debtors, in consultation with Wells Fargo.

h.   Auction. If a Qualified Bid is received on or before the Initial Bid Deadline, the Auction will be conducted at the offices of Crowell & Moring, LLP, 590 Madison Avenue, 20th Floor, New York, New York 10022-2524, on February 4, 2010 or another date to be scheduled by counsel for Debtors in consultation with Wells Fargo and set forth in the Auction and Hearing Notice. Only Qualified Bidders who submit Qualified Bids, as well as Wells Fargo and Stalking Horse, will be permitted to participate in the Auction, and they shall appear in person, or through a duly authorized representative, at the Auction. If no Qualified Bid is received, the Debtors may not proceed with an Auction and may immediately proceed to a Sale Hearing for approval of the FD APA.

---

[7] Famous Dave's was not required to post a contract deposit under the FD APA because it is owed approximately $850,000.00 on account of unpaid franchise fees. If (i)(x) Famous Dave's is selected as the Successful Bidder, (y) no auction is held, or (z) an auction is held and Famous Dave's fails to bid the amount of the Purchase Consideration and (ii) Famous Dave's fails to close, Debtors will have a claim for damages against Famous Dave's, which it may set-off against the unpaid franchise fees, and may assert additional damage claims suffered by the estates.

i.     "As Is, Where Is".  The Sale of the Assets shall be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Debtors, their agents or their estates. By submitting a bid, each Qualified Bidder shall be deemed to acknowledge and represent that it has had an opportunity to conduct any and all due diligence it requires regarding the Assets prior to making its offer, that it has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Assets in making its bid, and that it did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Assets, or the completeness of any information provided in connection therewith or the Auction, except: (i) as expressly stated in these Auction Procedures, (ii) as expressly stated in the FD APA, or (iii) as expressly stated in the APA of the Successful Bidder.

j.     Free of Any and All Interests.  Except as may otherwise be provided in the FD APA or in the APA of a Successful Bidder (defined below), in the event that Wells Fargo consents in writing to the proposed sale evidenced by such purchase agreement, which consent may be withheld in its sole discretion, all of Debtors' right, title and interest in and to the Assets subject thereto shall be sold free and clear of any pledges, liens, security interests, encumbrances, claims, charges, options and interests thereon (collectively, the "Interests") to the maximum extent permitted by section 363 of the Bankruptcy Code, with such Interests to attach to the net proceeds of the Sale of the Assets with the same validity and priority as such Interests applied against the Assets.

k.     Break-up Fee.  A Break-Up Fee (as defined hereinafter) of $150,000.00 which, subject to Bankruptcy Court approval, shall be paid to Famous Dave's out of the proceeds of the sale of the Assets to a person other than Famous Dave's; provided, however, that the amount of the Break-up Fee shall be $250,000 in the event that (i) Famous Dave's is not the Buyer of the Assets as a result of being outbid at the Auction and (ii) the Franchise Agreement with Famous Dave's is not assumed by Debtors and assigned to the winning Bidder at or after the Auction.  Except as expressly stated above with regard to Famous Dave's, no Qualified Bid shall include any request or entitle any Qualified Bidder to receive any break-up fee, termination fee, expense reimbursement or similar payment.  Famous Dave's has the right, but no obligation, to bid the amount of the Break-Up Fee, as part of any subsequent bid made by Famous Dave's at the Auction.

l.     Bid Increments.  Bidders who have submitted a Qualified Bid may improve their bids at the Auction in increments of $50,000 (as such bidding increment may be modified by the Debtors at the Auction). Should overbidding occur, Buyer shall have the right, but not the obligation, to participate in the bidding and to be approved as the Successful Bidder at the Sale Hearing based on any such subsequent

overbid. The bidding shall be continuous and shall not end until all bidders have been given the opportunity to submit their last and best offers.

m.  <u>Wells Fargo Credit Bidding</u>. Wells Fargo may make one or more credit bids for some or all of the collateral securing its claims to the full extent permitted by section 363(k) of Bankruptcy Code. Wells Fargo shall have the unqualified right to credit bid and may credit bid up to the full amount of the Prepetition Obligations (as such term is defined in the Interim DIP Order) (with no set-offs, reductions or defenses) for any Prepetition Collateral (as such term is defined in the Interim DIP Order) and/or the DIP Obligations (with no set-offs, reductions or defenses) against any Collateral (as such term is defined in the Interim DIP Order). Wells Fargo shall not be required to post any cash deposit either initially or upon designation as a Successful Bidder or Back-up Bidder (as both terms are defined below). In order to be a Qualified Bid, a credit bid of Prepetition Obligations must provide for payment in cash at closing and/or the assumption of any cure claims, the Break-up Fee, and sale-related administrative expense claims, and all carve-outs authorized by the Final DIP Order (when entered). Wells Fargo may, in its sole discretion, consent to an affiliate or a third party credit bidding or assuming all or part of the Prepetition Obligations or DIP Obligations as part of such party's Qualified Bid.

n.  <u>Determination of Highest and Best Offer</u>. If Qualified Bidders submit Qualified Bids, then as soon as practicable after the conclusion of the Auction, the Debtors shall: (i) review the highest and best offer of each Qualified Bidder on the basis of the financial and contractual terms and the factors relevant to the Sale process, including those factors affecting the speed and certainty of consummating the Sale; (ii) identify the highest or otherwise best offer or offers for the Sale Assets (to the extent any such bid is acceptable to Debtors, in consultation with Wells Fargo, each a "<u>Successful Bid</u>" and each bidder making such bid, a "<u>Successful Bidder</u>"); and (iii) designate any Back-Up Bidders (as defined below), all in consultation with Wells Fargo. The Debtors, in consultation with their professionals and Wells Fargo, reserve the right to determine the value of any offer submitted by a Qualified Bidder (either by itself or in connection with offers submitted by one or more other Qualified Bidders), and which offer or offers constitute the highest or best offer.

o.  <u>Auction Results</u>. The Debtors will announce the results of the Auction and the Successful Bidder for the Assets by filing a supplement to the Sale Motion with the Bankruptcy Court (the "Supplement") by no later than two (2) business days after the Auction. Any person interested in receiving a copy of the Supplement may obtain a copy of the document on-line at the website of the Bankruptcy Court for the District of New Jersey at https://ecf.njb.uscourts.gov  If you are not able to obtain the

copy through the Court's website, you may send a written request for a copy of the Supplement to counsel for the Debtors by no later than February 12, 2010 at 1:00 p.m.

p.   Back-Up Bids. The Successful Bidder and the second highest or otherwise best bid (the "Back-Up Bidder") shall supplement their respective deposits by wire transfer or other immediately available funds within one (1) business day so that, to the extent necessary, such deposit equals ten percent (10%) of the aggregate purchase price consideration of its bid (except that Famous Dave's shall be exempt from this requirement if it is the Successful Bidder or the Back-Up Bidder, but only if its bid is less than $8.5 million). If, for any reason, the Successful Bidder fails to consummate the purchase of the Assets, (i) the Back-Up Bidder will be deemed to have submitted the highest or otherwise best bid, (ii) the Debtors shall be authorized to effect the sale of the Assets to the Back-Up Bidder as soon as is commercially reasonable without further order of the Bankruptcy Court, and (iii) the Debtors shall retain the Successful Bidder's deposit as a reasonable estimate of the damages sustained by the Debtors for the Successful Bidder's failure to close. The Debtors' counsel shall retain the Back-Up Bidder's deposit in an interest-bearing trust account until the sale to the Successful Bidder closes, provided that the Back-Up Bidder provides Debtors' counsel with a federal tax identification number, at which time the deposit (plus accrued interest, if any) shall be returned to the Back-Up Bidder. If the Successful Bidder fails to close, the Back-Up Bidder's deposit shall be treated in the manner described in sub-paragraph (q) below.

q.   Acceptance of Qualified Bids. The Debtors shall sell the Assets to any Successful Bidder only upon (i) receiving Wells Fargo's written consent to a sale on the terms of Successful Bid, which consent may be withheld in its sole discretion, and (ii) the approval of a Successful Bid by the Bankruptcy Court after the Sale Hearing. The Debtors' presentation of a particular Successful Bid to the Bankruptcy Court for approval does not constitute the Debtors' acceptance of the bid. The Debtors, in consultation with Wells Fargo, may reject at any time before entry of an order of the Bankruptcy Court approving a Qualified Bid, any bid that is inadequate or insufficient, not in conformity with the requirements of the Bankruptcy Code, the Auction Procedures, or the terms and conditions of Sale, or contrary to the best interests of the Debtors, their estates and creditors. The Debtors will be deemed to have accepted a bid only when the bid has been consented to in writing by Wells Fargo and approved by the Bankruptcy Court at the Sale Hearing. All interested parties reserve their right to object to the Debtors' selection of any Successful Bidder on the terms set forth in the Order approving this Motion.

r.   Sale Hearing. A hearing to confirm the results of the Auction will be held before the Honorable Morris Stern, U.S.B.J., at the United States

Bankruptcy Court for the District of New Jersey, Martin Luther King, Jr. Federal Building, 50 Walnut Street, Newark, NJ 07102, on a date to be set by the Court (the "Sale Hearing"). At the Sale Hearing, the Debtors, after receiving Wells Fargo's written consent to a Sale or Sales on the terms of one or more Successful Bids, which consent may be withheld in its sole discretion, may present any Successful Bids to the Bankruptcy Court for approval.

s.   Escrow of Bid Deposits. All Deposits shall be held by Debtors' counsel in an interest-bearing bank account (assuming the bidder provides a Tax ID number), with interest for the account(s) of the bidder(s). Within two (2) business days after entry of the Sale Order, except to the extent such Deposits are subject to forfeiture under paragraph f above), Deposits shall be returned to all bidders except the Successful Bidder and the Back-Up Bidder. The deposit (plus accrued interest, if any) of the Successful Bidder or the Back-Up Bidder, as applicable, shall be applied to the purchase price in accordance with the APA.

t.   Objections. Objections, if any, to the Sale Motion (including, but not limited to) to the  Cure Amounts set forth in the Cure Exhibit) and any filed supplements thereto, shall: (i) be in writing; (ii) specify with particularity the basis of the objection; and (iii) be filed with the Court and simultaneously served on: (a) Debtors' counsel, Crowell & Moring LLP, 590 Madison Avenue, 20th Floor, New York, New York 10022-2524, Attn: Mark S. Lichtenstein, Esq, (b) counsel to the Buyer, Amy Swedberg, Esq., Maslon, Edelman, Borman & Brand LLP, 3300 Wells Fargo Center, 90 South Seventh Street, Minneapolis, Minnesota 55402-4140, (d) counsel to Wells Fargo, Sidley Austin LLP, 555 West Fifth St., Suite 4000, Los Angeles, CA 9013, Attn. Jennifer C. Hagle; and (d) the Office of the United States Trustee, One Newark Center, Suite 2100, Newark, NJ 07102, so as to be actually received by 4:00 p.m. on January 22, 2010.

u.   Reservation of Rights to Change Terms of Sale. Subject to prior consent by Wells Fargo, the Debtors reserve the right to (i) impose additional or different terms and conditions at or before the Auction and (ii) extend the deadlines set forth in the Auction Procedures and/or adjourn the Auction and/or the Sale Hearing in open court without further notice.

v.   Jurisdiction. Any and all disputes related or pertaining to or resulting or arising from the selection of the Successful Bids, the Sale of the Assets, and/or the conduct of any Bidder, the Debtors, or Wells Fargo, in connection therewith, shall be adjudicated solely by the Bankruptcy Court. The submission of the documents necessary to become a Qualified Bidder shall constitute such parties' express consent to the exclusive jurisdiction of the Bankruptcy Court for all such matters.

37.    The Debtors believe that the Auction Procedures offer the best opportunity for the Debtors to maximize the value of the Assets for the benefit of their estates, given the current circumstances and lending environment available to the Debtors. The Debtors submit that implementation of the Auction Procedures is in the best interests of their estates, and should be approved.

**B.    The Scheduling of the Hearings on Approval of the Auction Procedures and the Sale**

38.    The Debtors believe that it is appropriate to have the Auction Procedures approved at a hearing on the "First Day" motions because the relief sought is not unusual, and the Break-Up Fee and bidding increments as set forth in the FD APA were vigorously negotiated in good faith, and the existence of a stalking horse bid should provide a basis to generate robust and competitive bidding. Approval of the Auction Procedures very early in the case will provide the Debtors and their investment banker, Brookwood, to focus on what is really critical to this case – a broad marketing effort over as long a period as reasonably possible, while minimizing to the extent possible, the Debtors' incurrence of additional secured debt to fund operating expenses pending the sale. Clearly, continued operation of the restaurants, even by a third party, is preferable to liquidation and the shutting down of the restaurants.

39.    In the Fourth Amendment, the Debtors and Wells Fargo agreed that the Debtors would seek (all subject to Court availability) (i) a hearing on the Auction Procedures Motion at the first day hearing, but in any event, by no later than January 5, 2010, (ii) to schedule an auction for no later than February 4, 2010, (iii) a hearing to approve the sale by no later than February 11, 2010, and (iv) to have a closing of the sale by no later than February 28, 2010.

40.    In connection with these scheduling benchmarks, the consensual Budget governing use of cash collateral and the proceeds of debtor in possession ("DIP") financing runs through March 15, 2010 and the Debtors' authority to use cash collateral and to receive DIP

financing terminates on the earlier of March 15, 2010, the date of the closing of the sale of the

Assets or the date of a default under the DIP Credit Agreement (approval of which has also been

sought on a "First Day" basis) and/or the Financing Orders (as defined in the DIP Credit

Agreement).  As Wells Fargo has made it a condition of continued funding that the sale process

move forward in a timely fashion, the Debtors have chosen to seek approval of the Auction

Procedures Order earlier than contemplated under the Fourth Amendment.   If the Auction

Procedures Order is entered on December 22, 2009 (the date on which a hearing has been

scheduled with respect to the Debtors' "First Day" motions), the Debtors and their investment

banker will be able to concentrate more fully on seeking competitive bids for the Assets, and

potential bidders will have further certainty as to the auction procedures to be followed in this

process, thereby providing such potential bidders with additional time and certainty to put

together qualifying bids for the Assets.   Given the continuing difficulties in this lending

environment and the national holidays falling between the Petition Date and the projected

Auction date, the Debtors submit that approving the Bidding Procedures Order at the First Day

Hearing will foster the auction process and is in the best interests of the Debtors and their estates.

**C.**     **The Auction and Hearing Notice and Notice of Sale Motion**

41.     Under Bankruptcy Rule 2002(a) and (c), the Debtors are required to notify their

creditors of the proposed sale of Assets, including a disclosure of the time and place of the

Auction, the terms and conditions of the sale and the deadline for filing any objections.  The

Auction and Hearing Notice and proposed dates for the Auction and Sale Hearing comply with

Bankruptcy Rule 2002(c), and the Auction and Hearing Notice includes information on the

Auction Procedures necessary to enable interested parties to participate in the Auction and the

Sale Hearing.

42.    The Debtors propose to serve the Auction and Hearing Notice within three (3) business days after the entry of the Bidding Procedures Order, by first class mail, postage prepaid, to (a) all potential purchasers identified by the Debtors and Brookwood, (b) the Office of the United States Trustee, (c) the Debtors' twenty (20) largest unsecured creditors, (d) counterparties to all executory contracts and unexpired leases, (e) the parties in interest who have requested notice pursuant to Bankruptcy Rule 2002, (f) all known entities holding or asserting a security interest in or lien against any of the Assets, (g) Wells Fargo Bank, and (h) all government agencies required to receive notice of proceedings under the Bankruptcy Rules (the "Auction and Hearing Notice Service List"). All other creditors of the Debtors will receive notice by publication within three days after entry of the Bidding Procedures Order and again one week before the Auction Date in an appropriate publication.

43.    Within three (3) business days of the entry of the Bidding Procedures Order, the Debtors will also serve a copy of this Sale Motion, including all exhibits, by first class mail, postage prepaid, upon (i) all known entities holding or asserting a security interest in or lien against any of the Assets, including Wells Fargo, (ii) all taxing authorities whose rights may be affected by the sale of the Assets, (iii) the Office of the United States Trustee, (vi) counterparties to all executory contracts and unexpired leases, and (v) all parties that have requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "Service List"). The Auction and Hearing Notice provides that any party not on the Service List that wishes to obtain a copy of this Sale Motion, including all exhibits, may make such a request in writing to Crowell & Moring LLP, 590 Madison Avenue, 20th Floor, New York, New York 10022-2524, Attn:    Mark S. Lichtenstein,    Esq.,    Tel:    (212)    895-4200,    Fax:    (212)895-4201,    Email: mlichtenstein@crowell.com.

44.    In addition, the Debtors will file with the Court a supplement to the Sale Motion (the "Supplement"), which shall report to the Court the results of the Auction and the highest or otherwise best offer for the Assets.  The Supplement shall identify, among other things, (i) the proposed purchaser of the Assets, (ii) the Assets to be acquired, (iii) the consideration to be paid by such purchaser of the Assets, and (iv) the material terms upon which such purchase is based.  In addition, the Debtors will annex to the Supplement, as exhibits, copies of the APA entered into by the Debtors and the purchaser of the Assets.

45.    The Debtors will file the Supplement by no later than two (2) business days following the conclusion of the Auction.  The Debtors propose to serve the Supplement, including any exhibits thereto, on the Service List, upon any statutory committee that has been appointed in these cases, and upon any party that previously requested a copy of the Sale Motion.  The Debtors submit that the notice to be provided through the Auction and Hearing Notice, the Sale Motion and the Supplement, as well as the Assumption and Assignment Notice (discussed below) and the method of service proposed herein constitutes good and adequate notice of the sale of the Assets and the proceedings to be held with respect thereto.  Therefore, the Debtors respectfully request that the Court approve the foregoing notice procedures on a "First Day" basis.

**D.    Break-Up Fee and Overbid Protection**

46.    The Debtors request approval of the payment to Buyer of a break-up fee (the "Break-Up Fee") of $150,000.00 which, subject to Bankruptcy Court approval, shall be paid out of the proceeds of the sale of the Assets to a person other than Famous Dave's; provided, however, that the amount of the Break-up Fee shall be $250,000.00 in the event that (i) Famous Dave's is not the Successful Bidder of the Assets as a result of being outbid at the Auction and (ii) the Franchise Agreement with Famous Dave's is not assumed by Debtors and assigned to the

winning Bidder at the Auction. The Break-up Fee represents between three percent (3%) and

five percent (5%) of the purchase price under the FD APA.

47.     As discussed above, the inclusion of the Break-up Fee was an express condition

precedent to Buyer's execution of the FD APA and is meant to compensate Buyer for the value it

adds as a stalking horse bidder and to reimburse Buyer for its costs and expenses incurred in the

event Buyer is not approved as the purchaser of the Assets. Approval of break-up fees and other

forms of bidding protections in connection with the sale of significant assets pursuant to section

363 of the Bankruptcy Code has become an established practice in chapter 11 cases. Under the

circumstances of this case, the proposed Break-Up Fee is necessary to enable the Debtors to

enter into the stalking horse APA and thereby (i) induce one or more potential purchasers to

submit a higher or otherwise better bid that might not otherwise be forthcoming and (ii) increase

the likelihood that the Debtors will receive the highest or otherwise best offer for the Assets to

the benefit of the Debtors, their estate and creditors.

48.     Ample support exists for the Debtors' request for approval of the Bidding

Protections. The United States Court of Appeals for the Third Circuit has considered the

standards that should govern an award of break-up fees and related expenses in the context of a

chapter 11 case. In re O'Brien Environmental Energy, Inc., 181 F.3d 527 (3d Cir. 1999). In that

case, the Third Circuit concluded that the jurisprudence governing the general allowance of

administrative claims pursuant to section 503(b) of the Bankruptcy Code should govern the

authorization of break-up fees and related expenses for the initial bidder in an auction process.

Id. at 535. The Third Circuit explained that "the allowability of break-up fees, like that of other

administrative expenses, depends upon the requesting party's ability to show that the fees were

actually necessary to preserve the value of the estate." Id. Accordingly, to be approved, bidding incentives must provide some benefit to a debtor's estate. Id. at 533.

49.    O'Brien identified at least two instances in which bidding incentives may provide benefit to the estate. First, benefit may be found if "assurance of a break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." Id. at 537. Second, where the availability of bidding incentives induce a bidder to research the value of the debtor and submit a bid that serves as a minimum or floor bid on which other bidders can rely, "the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." Id.

50.    The Break-Up Fee meets the Third Circuit's "administrative expense" standard. The Break-Up Fee is reasonable because it (i) is not excessive compared to fees and reimbursements approved in other cases in this Circuit and (ii) will not diminish the Debtors' estates. Break-Up fees, such as that proposed herein, enable a debtor to assure a sale to a contractually committed bidder at a price the debtor believes is fair and reasonable, while providing the debtor with the opportunity of obtaining even greater benefits for the estate through an auction process. The Break-Up Fee meets the O'Brien standard, as it is reasonable, will promote competitive bidding, will not "chill" the bidding process, and its availability will increase the likelihood that the price at which the Assets are sold will reflect their true worth. Further, absent the approval of the Break-Up Fee, the Buyer would not enter into the FD APA. Therefore, the Debtors respectfully submit that the Break-Up Fee should be approved.

51.    The Debtors also request approval of the Auction Procedures, including the Break-Up Fee and other bidding procedures. Importantly, as noted above, Buyer was unwilling

to enter into the FD APA unless both the Break-up Fee and the other Auction Procedures are approved.  The Lender are only willing to fund the Debtors' operations if the sale process is timely prosecuted.  Therefore, all reasonable steps should be taken to expedite the sale process and provide for appropriate bidding procedures.  The Debtors have an urgent need to seek expeditious approval of the Auction Procedures, including the Break-up Fee, to keep the sale process moving towards a prompt conclusion.

**E.      Proposed Procedures For And Notice Of Assumption And Assignment Of Executory Contracts And Unexpired Leases**

52.      Additionally, the Debtors, as part of the sale, are prepared to assume and assign certain executory contracts and unexpired leases associated with the Assets (the "Subject Contracts") to the applicable Successful Bidder(s) to the extent that such Successful Bidder(s) desires Subject Contracts as part of the corresponding Successful Bid.  As soon as practicable, but no later than fourteen (14) days after the entry of the Bidding Procedures Order, the Debtors will file with the Bankruptcy Court a schedule of cure obligations (the "Cure Schedule") with a notice (the "Assumption and Assignment Notice") respecting the Subject Contracts, substantially in the form of Exhibit B, attached hereto.  The Cure Schedule will include a description of each Subject Contract potentially to be assumed and assigned under the FD APA or other agreement with a Successful Bidder and the amount, if any, the Debtors believe is necessary to cure such agreements pursuant to section 365 of the Bankruptcy Code (the "Cure Amounts").  A copy of the Cure Schedule and Assumption and Assignment Notice will be served on each of the non-Debtor parties listed on the Cure Schedule by first class mail on the date that the Cure Schedule is filed with the Bankruptcy Court.   Any objections to the assumption and assignment of any Subject Contract identified on the Cure Schedule, including, but not limited to, objections relating to adequate assurance of future performance or to the Cure Amounts set forth on the

Cure Schedule, must be in writing, filed with the Bankruptcy Court, and be actually received on or before January 22, 2010 at 4:00 p.m. (EST) by (i) the Debtors, (ii) counsel for the Debtors, (iii) counsel to Famous Dave's, (iv) counsel to Wells Fargo, and (v) the Office of the United States Trustee.

53.     Any objection to the Cure Amounts shall set forth the specific default or defaults in any Subject Contracts and set forth the specific monetary amount that differs from the amount (if any) specified by the Debtors in the Cure Schedule.

54.     If no objections are received, then the Cure Amounts set forth in the Cure Schedule will be binding upon the non-Debtor parties to the Subject Contracts for all purposes in these chapter 11 cases and otherwise, and will constitute a final determination of the total Cure Amounts required to be paid by the Debtors in connection with the assumption and assignment of the Subject Contracts.  In addition, all counterparties to the Subject Contracts will: (a) be forever barred from objecting to the Cure Amounts and from asserting any additional cure or other amounts with respect to the Subject Contracts, and the Debtors and the Successful Bidder(s) will be entitled to rely solely upon the Cure Amounts set forth in the Cure Schedule, (b) be deemed to have consented to the assumption and assignment, and (c) be forever barred and estopped from asserting or claiming against the Debtors or the Successful Bidder(s) that any additional amounts are due or other defaults exist, that conditions to assignment must be satisfied under such Subject Contracts or that there is any objection or defense to the assumption and assignment of such Subject Contracts.

55.     Where a non-Debtor counterparty to a Subject Contract files an objection asserting a cure amount higher than the proposed Cure Amounts (the "Disputed Cure Amount"), then: (a) to the extent that the parties are able to consensually resolve the Disputed Cure Amount

prior to the Sale Hearing, and subject to the consent of the Successful Bidder(s) to such resolution, the Debtors shall promptly provide Wells Fargo and other parties in interest notice and an opportunity to object to such proposed resolution, or (b) to the extent the parties are unable to consensually resolve the dispute prior to the Sale Hearing, then the amount to be paid under section 365 of the Bankruptcy Code with respect to such Disputed Cure Amount will be determined at the Sale Hearing (or at such other date and time as may be fixed by this Court). At the election of the Debtors, the executory contract that is the subject of a Disputed Cure Amount may none the less be assigned to the Successful Bidder(s) at closing free and clear of the objection so long as the amount relating to the Disputed Cure Amount is escrowed by the relevant Debtor. The Debtors intend to cooperate with counterparties to Subject Contracts to attempt to reconcile any differences in a particular Cure Amount.

56.     The Debtors request that any party failing to object to the proposed transactions be deemed to consent to the treatment of its executory contract and/or unexpired lease under section 365 of the Bankruptcy Code. See Hargrave v. Twp. of Pemberton (In re Tabone, Inc.), 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to sale motion, creditor deemed to consent); Pelican Homestead v. Wooten (In re Gabeel), 61 B.R. 661, 667 (Bankr. W.D. La. 1985) (same). Moreover, the Debtors request that each such party be deemed to consent to the assumption and assignment of its executory contract and/or unexpired lease notwithstanding any anti-alienation provision or other restriction on assignment. See 11 U.S.C. §§ 365(c)(1)(B), (e)(2)(A)(ii), and (f).

## PART II

57.     In Part II of this Sale Motion, the Debtor seeks approval of (i) the sale of the Assets free and clear of liens, claims and encumbrances, (ii) the assumption and assignment of certain executory contracts and unexpired leases (or, alternatively, the rejection of any such

contracts and leases that are not being assumed by the successful purchaser), and (iii) the

exemption of the sale of the Assets from stamp or similar taxes.

**A.**      **The Sale of the Debtors' Assets Should Be Approved**

58.      The Debtors submit that ample authority exists for the approval of the proposed

sale of the Assets.  Section 363 of the Bankruptcy Code, which authorizes a debtor to sell assets

of the estate other than in the ordinary course of business free and clear of liens, claims and

encumbrances, provides, in relevant part, as follows:

> (b)(1)  The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate.
>
> (f)      The trustee may sell property of the estate under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if –
>
> > (1)      applicable nonbankruptcy law permits sale of such property free and clear of such interest;
> >
> > (2)      such entity consents;
> >
> > (3)      such interest is a lien and the price at which the property is sold is greater than the aggregate value of all liens on such property;
> >
> > (4)      such interest is in bona fide dispute; or
> >
> > (5)      such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

See 11 U.S.C. § 363(b)(1), (f); see Fed. R. Bankr. P. 6004(f)(1) ("All sales not in the ordinary

course of business may be by private sale or by public auction.").

59.      Section 363 of the Bankruptcy Code does not set forth a standard for determining

when it is appropriate for a court to authorize the sale or disposition of a debtor's assets prior to

confirmation of a plan.  However, courts in the Third Circuit and beyond have required that the

decision to sell assets outside the ordinary course of business be based upon the sound business

judgment of the debtor.  See In re Abbots Dairies of Pennsylvania, Inc., 788 F.2d 143 (3d Cir.

1986); In re Delaware & Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991); In re Phoenix Steel

Corp., 82 B.R. 334, 335-36 (Bankr. D. Del. 1987) (stating that judicial approval of a section 363

sale requires a showing that the proposed sale is fair and equitable, a good business reason exists

for completing the sale and that the transaction is in good faith); see also Committee of Equity

Security Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983); In re

Chateaugay Corp., 973 F.2d 141 (2d Cir. 1992); Stephens Indus. v. McClung, 789 F.2d 386, 390

(6th Cir. 1986) ("bankruptcy court can authorize a sale of all of a Chapter 11 debtor's assets

under § 363(b)(1) when a sound business purpose dictates such action"); In re Titusville Country

Club, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); In re Indus. Valley Refrig. & Air Conditioning

Supplies, Inc., 77 B.R. 15, 20 (Bankr. E.D. Pa. 1987).

60.     The "sound business purpose" test requires that a debtor establish four elements to

sell property outside the ordinary course of business, namely (a) that a "sound business purpose"

justifies the sale of assets outside the ordinary course of business, (b) that adequate and

reasonable notice has been provided to interested persons, (c) that the debtor has obtained a fair

and reasonable price, and (d) good faith.  See Abbots Dairies, infra; Titusville, 128 B.R. at 399;

In re Sovereign Estates, Ltd., 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989); Phoenix Steel, 82 B.R.

at 335-36; Industry Valley, 77 B.R. at 21.  Courts have made it clear that a debtor's showing of a

sound business justification need not be unduly exhaustive, but, rather, a debtor is "simply

required to justify the proposed disposition with sound business reason."  In re Baldwin United

Corp., 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984).

61.     Consideration of the above factors in this case unequivocally establishes that the

proposed sale should be approved.  Prior to and since the Petition Date, the Debtors worked

diligently with their professionals to explore alternatives to a sale of substantially all of the

Assets, including restructuring the senior secured debt in a manner designed to permit the Debtors to satisfy its substantial unsecured debt and secured debt while hopefully creating value for the equity holders.    Additionally, since prior to the Petition Date, the Debtors, with the assistance of Brookwood, have actively marketed the Assets to maximize the recovery for the estates.   The Debtors' decision to sell the Assets is based upon their sound business judgment in consideration of their inability to maintain their financing other than in the context of a section 363 sale, and their duty to maximize the value of the Assets as a going concern for the benefit of their estates and creditors.

62.    The FD APA represents the best offer received to date for the proposed acquisition of the Assets and the best opportunity for Debtors to to maximize the value of their assets and serve as a basis for conducting an auction of the Assets.   To ensure that the value of the Assets is maximized, however, the FD APA is expressly subject to higher or otherwise better offers.    The Debtors believe there is no better evidence of value than what the market will ultimately bear.   The Auction Procedures described herein will ensure that the Debtors receive the maximum value for the Assets and that the purchase price ultimately realized by the estate will be fair and reasonable.   Accordingly, the Debtors submit that consideration of the business reasons articulated herein leads to the inescapable conclusion that the Debtors should be authorized to sell the Assets.

**B.    Sale Free and Clear of Liens, Claims and Encumbrances**

63.    In accordance with section 363(f) of the Bankruptcy Code, a debtor in possession may sell property under section 363(b) "free and clear of any interest in such property of an entity other than the estate" if one of the following conditions is satisfied:

> (1)    applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2)     such entity consents;

(3)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4)     such interest is in bona fide dispute; or

(5)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

See 11 U.S.C. § 363(f); In re Elliot, 94 B.R. 343, 354 (E.D. Pa. 1988) (section 363(f) written in disjunctive; court may approve sale "free and clear" provided at least one of the subsections is met). The Debtors expect that they can satisfy the Court that the second, third or fourth of these requirements has been met.

64.     In order to facilitate the sale of the Assets, the Debtors require authorization to sell them free and clear of any and all liens or interests that may be asserted, with such liens to attach to the sale proceeds.

65.     Several parties allegedly hold security interests and/or a lien or other encumbrance on the Assets being sold. The Lender is owed in excess of $13 million and holds a validly perfected security interest and lien upon substantially all of the Debtors' assets and, upon approval of the DIP Motion, will have a validly perfected security interest and lien upon all of the Debtors' assets. Wells Fargo has consented to the sale subject to its right to credit bid its secured claim at an Auction for the Assets under section 363(k) of the Bankruptcy Code.

66.     There are also several other parties that allegedly have liens on specific property of the estates such as on specific equipment, furniture or fixtures. To the extent that any party is determined to have a valid lien on the Assets, any and all such liens on the Assets will be satisfied or will attach to the proceeds of a sale of the Assets with the same force, effect and priority as such liens have on the Assets, subject to the rights and defenses, if any, of the Debtors and any party in interest with respect thereto. Accordingly, the Debtors submit that the sale of

the Assets free and clear of liens, claims and encumbrances satisfies the statutory prerequisites of

section 363(f) of the Bankruptcy Code.

**C.    Assumption and Assignment of Executory Contracts and Unexpired Leases**

67.    In order to facilitate and effect the sale of the Assets, the Debtors also seek to

assume and assign certain executory contracts and unexpired leases to the purchaser of the

Assets to the extent required.  Section 365 of the Bankruptcy Code authorizes a debtor to assume

and/or assign its executory contracts and unexpired leases subject to the approval of the

bankruptcy court:

> (a)    Except as provided in . . . subsections (b), (c), and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.
>
> (b)(1)    If there has been a default in an executory contract or unexpired lease of the debt the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee:
>
>> (A)    cures, or provides adequate assurance that the trustee will promptly cure such default;
>>
>> (B)    compensates or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
>>
>> (C)    provides adequate assurance of future performance under such contract or lease. . . .
>
> (f)(2)    The trustee may assign an executory contract or unexpired lease of the debtor only if –
>
>> (A)    the trustee assumes such contract or lease in accordance with the provisions of this section; and
>>
>> (B)    adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

See 11 U.S.C. §§ 365(a), (b)(1), (f)(2).  Accordingly, section 365 authorizes the proposed

assumptions and assignments, provided that the defaults under such contracts and leases are

cured and adequate assurance of future performance is provided.

68.     The meaning of "adequate assurance of future performance" depends on the facts

and circumstances of each case, but should be given "practical, pragmatic construction."  See

Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. ?.D.N.Y.

1989); see also In re Natco Indus., Inc., 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate

assurance of future performance does not mean absolute assurance that the debtor will thrive and

pay rent); In re Bon Ton Rest. & Pastry Shop, Inc., 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985)

("Although no single solution will satisfy every case, the required, assurance will fall

considerably short of an absolute guarantee of performance.").

69.     Among other things, adequate assurance may be given by demonstrating the

assignee's financial health and experience in managing the type of enterprise or property

assigned.  In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance

of future performance is present when prospective assignee of a lease from debtor has financial

resources and has expressed a willingness to devote sufficient funding to business in order to

give it strong likelihood of succeeding; chief determinant of adequate assurance is whether rent

will be paid).

70.     In connection with the Sale Hearing, the Debtors will provide evidence that all

requirements for the assumption and/or assignment of the executory contracts and unexpired

leases proposed to be assigned to the purchaser of the Assets will be satisfied.  It is an express

condition of the Auction Procedures that bidders submit their Adequate Assurance Packages

(defined in the Auction Procedures) containing sufficient financial and other information to

assess the bidder's compliance with section 365 of the Bankruptcy Code.  The Debtors will

provide all parties to executory contracts and unexpired leases to be assumed and assigned

pursuant to the Sale Motion with such Adequate Assurance Packages and an opportunity to be

heard.  Thus, the Debtor respectfully submit that by the conclusion of the Sale Hearing,

assumption and assignment of the executory contracts and unexpired leases should be approved.

### D.    Rejection of Unsold Contracts and Leases

71.    The Debtors are hopeful that all of the Assets will be sold on acceptable terms and

conditions.  However, in the event that there are any executory contracts or unexpired leases that

remain unsold at the conclusion of the Auction, the Debtors reserve the right to request authority

at the Sale Hearing to reject any or all such unsold executory contracts and unexpired leases.

After concluding the Auction and selling the Assets, the unsold executory contracts and

unexpired leases may be valueless to the Debtors and would only create an administrative

expense burden on the Debtors' estates.  Therefore, the Debtors request authority to reject, as of

the date of the Sale Hearing, some or all executory contracts and unexpired leases they believe to

have no value.  As set forth in the FD APA, Purchaser, and any other bidder, may choose not to

acquire the restaurants located in Metuchen, New Jersey, Manchester, New Hampshire or

Hillsborough, New Jersey.  Other bidders also may exclude certain Assets.  In that event, the

leases for these restaurants, among other contracts, may be rejected.

### E.    Cure Amounts

72.    In order to ascertain the net benefit to the estates from the assignment of their

executory contracts and unexpired leases, the Debtors need to accurately determine the extent of

their cure obligations, if any.  Consequently, as noted above, within fourteen (14) days of entry

of the Bidding Procedures Order, the Debtors intend to file with the Court and serve upon the

parties to the Debtors' executory contracts and unexpired leases that the Debtors believe may be

subject to assumption and assignment (or rejection), among other things, a list and description of all Subject Contracts and the cure amounts (the "Cure Amounts"), if any, reflected in the Debtors' books and records as of the date the Cure Exhibit is filed with the Court.

73.     A separate hearing to consider any objections to the proposed Cure Amounts will be held on a date to be established by the Court.  As noted above, the Debtors request that any party failing to object to the proposed assumption and assignment of its Executory Contract and the listed cure amount (if any) be deemed to consent to the treatment of its Executory Contract under section 365 of the Bankruptcy Code and this Sale Motion, including, but not limited to, the Cure Amounts.  See Hargrave v. Township of Pemberton (In re Tabone, Inc.), 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to sale motion, creditor deemed to consent); Pelican Homestead v. Wooten (In re Gabel), 61 B.R. 661, 667 (Bankr. W.D. La. 1985) (same). Moreover, the Debtors request that each such party be deemed to consent to the assumption and assignment of its Executory Contract notwithstanding any anti-alienation provision or other restriction on assignment.  See 11 U.S.C. §§ 365(c)(1)(B), (e)(2)(A)(ii) and (f).

**F.     Exemption of Bulk Sale Statutes or Other Statutes**

74.     Certain states and localities in which the Assets of the Debtors are located have or may have statutes or regulations requiring creditor notification before bulk transfers are conducted or other restrictions concerning the sale (or liquidation) of the Assets.  The Debtors have not conducted a comprehensive study of such requirements for every state, city and town in which the Assets are located.  However, certain of the statutes and regulations may provide that if a liquidation or bankruptcy sale is court authorized, then a company need not comply with such statutes or regulations.  Moreover, in the context of bankruptcy cases such as these, where creditors are given notice of the proposed sale in advance, as well as an opportunity to be heard before this Court, the application of such statutes and regulations would be redundant and

unnecessary. Accordingly, the Debtors seek the authorization to consummate the sale of the Assets without the necessity of complying with any state or local bulk transfer law or other requirements.

**G.    The Automatic Fourteen Day Stay Under Bankruptcy Rules 6004(g) And 6006(d) Should Be Waived.**

75.    Pursuant to Bankruptcy Rule 6004(h), unless the Court orders otherwise, all orders authorizing the sale of property pursuant to section 363 of the Bankruptcy Code are automatically stayed for fourteen days after entry of the order. Similarly, under Bankruptcy Rule 6006(d), unless the Court orders otherwise, all orders authorizing the assignment of executory contracts or unexpired leases are automatically stayed for fourteen days after entry of the order.

76.    Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 14-day stay period, Collier on Bankruptcy suggests that the 14-day stay period should be eliminated to allow a sale or other transaction to close immediately where there has been no objection to the procedure. 10 Collier on Bankruptcy ¶ 6004.09 (15th ed. 1999). Furthermore, Collier on Bankruptcy provides that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time necessary to file such appeal. Id.

77.    To preserve and maximize the value of their assets for the benefit of all creditors, the Debtors seek to close the Sale immediately after all closing conditions have been met or waived. Thus, waiver of any applicable stays afforded by the Bankruptcy Rules is appropriate under the facts and circumstances of these cases.

## WAIVER OF MEMORANDUM OF LAW

78.     The Motion does not raise any novel issues of law and, accordingly, the Debtors

respectfully requests that the Court waive the requirement contained in D.N.J. LBR 9013-2 that a

separate memorandum of law be submitted.

## NOTICE

79.     Notice of this Sale Motion and proposed form of order has been served on all

parties on the Service List.

## NO PRIOR REQUEST

80.     No prior motion for the relief requested herein has been made to this or any other

court other than the prior Verified Application filed on December 19, 2009 but not served, which

is superseded in its entirety by this Amended Verified Application.

WHEREFORE, the Debtors respectfully request entry of: (A) an order substantially in

the form annexed hereto (i) approving the Auction Procedures including the Break-Up Fee; (ii)

approving the form and manner of notice of the sale or sales of the Debtors' Assets; (iii)

approving the form and manner of notice of the proposed assumption and assignment, including

cure amounts, of executory contracts and unexpired leases; (iv) establishing the date for the Sale

Hearing; and (vi) granting related relief; and (B) the order substantially in the form annexed

hereto: (i) approving the sale(s) of all or substantially all of the Debtors' Assets free and clear of

all Liens (with such Liens attaching to the proceeds of sale as described above); (ii) authorizing

the Debtors to assume and assign the Subject Contracts; and (iii) granting related relief..

Respectfully submitted,

**CROWELL & MORING LLP**
*Attorneys for North Country BBQ Ventures, Inc. et al.*

By:    /s/ *Mark S. Lichtenstein*
        Mark S. Lichtenstein

Dated:  December 21, 2009

## VERIFICATION

DAVID REILLY, of full age, certifies as follows:

1.      I am the acting Chief Financial Officer of North Country BBQ Ventures, Inc., one
of the within debtors and debtors-in-possession (the "Debtors").  As such, I have full knowledge
of the facts set forth in, and am duly authorized to make this Application on the Debtors' behalf.

2.      I have read the Amended Verified Application and certify that the statements
contained therein are true based upon my personal knowledge, information and belief, except for
paragraph 4, 7, and 9 through 13.  With respect to these paragraphs, I am aware of these facts
based on various discussions and my involvement with the debtors and generally believe them to
be true.

3.      I am aware that if any of the factual statements contained in the Application are
willfully false, I am subject to punishment.

Dated:  December 21, 2009                    /s/ David Reilly_____
                                             DAVID REILLY, Acting CFO